IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CROWN CORK & SEAL COMPANY, INC., )<br>)<br>Plaintiff and )<br>Counterclaim Defendant, )<br>)<br>v. )<br>)<br>THE INTERNATIONAL ASSOCIATION OF )<br>MACHINISTS AND AEROSPACE )<br>WORKERS, AFL-CIO, et al., )<br>)<br>Defendants and )<br>Counterclaim Plaintiffs. )<br>_____ ) | 8:03CV222<br><br><br><br><br>MEMORANDUM DECISION<br>AND ORDER |

Before the court are cross-motions for summary judgment filed by Counterclaim Defendant, Crown Cork & Seal Company, Inc. ("Crown") (Filing No. 82) and Counterclaim Plaintiff, International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM" or "the Union") (Filing No. 84). Having reviewed the motion, the parties' briefs and evidentiary submissions, and the applicable law, the court denies Crown's motion for summary judgment and denies IAM's motion for summary judgment.

## BACKGROUND

Crown is a Pennsylvania Corporation engaged in the business of manufacturing packaging materials. Defendant IAM is a labor organization representing employees in industries affecting commerce. IAM has represented employees of Crown and its predecessor, Continental Can Company ("Continental").

Continental and IAM were parties to a series of successive collecting bargaining agreements ("Continental Master Agreements").[1] The last Continental Master Agreement was effective from April 1, 1989, to March 31, 1993. The Continental Master Agreements contained provisions regarding retiree health benefits.[2] As of 1990, all Continental retirees who had been represented by IAM were insured under a single insurance policy effective April 1, 1981 ("1981 Insurance Plan"), irrespective of retirement date.

On July 15, 1990, Crown acquired Continental's Metal Division. At that time, Crown assumed all Continental Master Agreements and related benefit plans. Employees retiring before March 31, 1993, who worked for both Continental and Crown after the acquisition, remain insured under the 1981 Insurance Plan.

Since April 30, 1993, Crown and IAM have been parties to a series of successive collective bargaining agreements ("Crown Master Agreements").[3] Between 1993 and August 1, 2003, Crown retirees and their dependents received health benefits under one of three plans: (1) an April 30, 1993, plan which covered all Represented Crown Employees retiring between April 30, 1993, and April 1, 1999 ("1993 Insurance Plan"); (2) an April 1, 1999, plan which covered all Represented Crown Employees retiring between April 1, 1999, and April 1, 2002 ("1999 Insurance Plan"); and (3) a June 1, 2002,

---

[1] Continental Master Agreements exist for the following effective dates: December 1, 1968 - March 31, 1971; April 1, 1974 - April 14, 1977; December 11, 1977 - March 31, 1981; April 1, 1981 - April 1, 1984; April 1, 1986 - March 31, 1989; and April 1, 1989 - March 31, 1993.

[2] Beginning in 1981, the insurance policy was not contained in the Continental Master Agreement itself, but was rather incorporated by reference into the agreement.

[3] Crown Master Agreements exist for the following effective dates: April 30, 1993 - March 31, 1996; April 1, 1996 - March 31, 1999; April 1, 1999 - March 31, 2002; and April 1, 2002 - March 31, 2005.

plan (which was applied retroactively to April 1, 2002) covering all Represented Crown Employees retiring between April 1, 2002, and June 1, 2005.

In June 2003, Crown informed IAM that it would be adopting a new health plan for all Represented Crown/Continental Retirees who had retired prior to April 1, 2002. Crown alleges that is has the authority to unilaterally modify retirees' health plans pursuant to reservation-of-rights clauses contained in the 1981, 1993, and 1999 Insurance Plans.[4]

The new plan, which took effect on August 1, 2003, superseded all prior Continental and Crown health plans. The changes to retiree health benefits under the new plan included increases to lifetime maximum benefits, premium sharing, increased deductibles and out-of-pocket limits, decreased coverage of hospitalization, and elimination of coverage for some dependents.

On or about July 1, 2003, IAM filed a grievance with Crown regarding adoption of the new retiree health plan. The Union's grievance was filed pursuant to the grievance and arbitration procedure contained in all Continental and Crown Master Agreements covering "any difference between the Local Management and the Union or Employees as to the interpretation or application of, or compliance with, this Agreement respecting wages, hours, or conditions of employment." Filing No. 87, Ex. 13, pg. 27, Art. 13. Each of the grievance provisions also contained an arbitration clause.

---

[4] The 1981 Insurance Plan provides that "Continental hopes and expects to continue the Plan indefinitely, but reserves the right to change or terminate it in the future, subject naturally, to any outstanding contractual agreement."

The 1993 and 1999 Insurance Plans contain similar language providing that "Crown expects to continue these plans indefinitely, but reserves the right to amend, modify, or discontinue the plans at any time subject to, and within the framework of, applicable federal legislation and subject to any outstanding contractual agreements. The plans do not provide for benefit payments in any case or under any condition not identified and provided for in the plans."

3

Crown refused to arbitrate the dispute claiming the dispute was not arbitrable under the terms of any Master Agreement. Crown thereafter filed an action for declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201-2202. Crown sought a declaration under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA" or "Count I"), and section 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA" or "Count II") that it had the right to unilaterally modify retiree medical benefits under the Continental and Crown Master Agreements. Defendants IAM, McColley, Kirchner, and Anderson subsequently filed motions to dismiss Crown's complaint. IAM also filed a counterclaim against Crown seeking to compel arbitration of the dispute under the Master Agreements' grievance and arbitration procedures.

In its January 20, 2004, Memorandum and Order, Judge Thomas Shanahan granted defendants' motions to dismiss both counts of Crown's complaint. Filing No. 56. The court found that Crown could not seek declaratory relief under ERISA because it had not stated a cause of action to "enforce" the plan. The court also found that Crown was precluded from seeking declaratory relief under the LMRA because the *Alsager* declaratory judgment factors did not favor rendering a declaratory judgment under the LMRA. *Alsager v. District Court of Polk Co., Iowa*, 518 F.2d 1160 (8th Cir. 1975).

In this same order, the court also addressed IAM's contention that the court should dismiss Count I for the reason that Crown was obligated to submit the dispute to arbitration. Although the court did not ultimately dismiss Count I on that basis, the court noted:

> With respect to whether the issues in this lawsuit are subject to arbitration, the court agrees with at least three of the reasons that Crown named in its brief for rejecting IAM's motion to order arbitration. First, as a union, IAM

4

> does not have standing to proceed to arbitration on behalf of retirees, who are no longer employees for whom the union speaks as an exclusive representative and who have not consented to arbitration. Second, the contractual grievance procedure does not cover disputes concerning retiree rights: the parties to the collective bargaining agreement did not contract to arbitrate such disputes. Third, IAM has not shown that the action fits into the recognized categories of disputes that remain arbitrable following the expiration of a collective bargaining agreement.

Filing No. 56 at 9. The court went on to discuss, without deciding, whether the dispute remained arbitrable. The court explained that the critical question for purposes of determining arbitrability was whether the retirees' benefits had vested. After the court's January 20, 2004, Order, the only claim remaining in this litigation was the counterclaim to compel arbitration.

Crown and IAM thereafter filed cross-motions for summary judgment as to the counterclaim. Crown contends that it is entitled to summary judgement as a matter of law on IAM's counterclaim to compel arbitration because the retiree health insurance benefits are "clearly not vested." IAM, on the other hand, argues that the court should compel arbitration of this dispute as a matter of law. Specifically, IAM contends (1) the court should apply the strong presumption favoring arbitrability of disputes over interpretation and application of present and past collective bargaining agreements; (2) that the dispute between IAM and Crown is arbitrable; (3) that IAM has standing to pursue arbitration in its own right; and (4) that whether retiree matters can be arbitrated is a matter of procedural arbitrability to be resolved by the arbitrator.

Interestingly, neither Crown nor IAM devoted much of their memoranda to the issue of whether IAM has standing to compel arbitration. This is somewhat puzzling to the court in light of Judge Shanahan's prior discussion in its July 20, 2004, Memorandum and Order

5

regarding IAM's lack of standing to compel arbitration. Although IAM's counterclaim to compel arbitration was not directly at issue in the motion to dismiss, the court's standing discussion is still on point. Despite this guidance from the court, Crown did not even raise the issue of IAM's standing to compel arbitration in its motion for summary judgment. Instead, IAM first raised the issue. Notwithstanding the parties' apparent lack of focus on the issue, the court will address IAM's standing in this case, because of its prime importance to the court's subject matter jurisdiction over this dispute. *See South Dakota Farm Bureau v. Hazeltine*, 340 F.3d 583, 591 (8th Cir. 2003) (if a plaintiff lacks standing, a court is without subject matter jurisdiction).

## DISCUSSION

Before addressing the arbitrability of this dispute, the court must first resolve the issue of whether IAM even has standing to compel arbitration. In its earlier Memorandum and Order, the court stated that IAM did "not have standing to proceed to arbitration *on behalf of retirees*, who are no longer employees for whom the union speaks as its exclusive representative and *who have not consented to arbitration.*") (emphasis added). Filing No. 56 at 9. In its motion for summary judgment, IAM contends, that it has standing to pursue arbitration "on its own, institutional, behalf." To support this contention, IAM cites the decision of the Eighth Circuit Court of Appeals in *Anderson v. Alpha Portland Industries, Inc.*, 752 F.2d 1293, 1297-98 (8th Cir. 1985) (en banc). After careful analysis of the circuit's decision in *Anderson* and as the cases cited therein, the court concludes that *Anderson* does not support IAM's "institutional standing" contention.

In *Anderson*, the Eighth Circuit held that grievance remedies in collective bargaining agreements ("CBA's") do not have to be exhausted by retirees. *Anderson*, 752 F.2d at

6

1298. Retired employees brought an action against their former employer under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and section 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132, to recover insurance benefits under collective bargaining agreements in effect when they retired. 752 F.2d 1294. The group insurance plan provided that any dispute arising under the policy was subject to the grievance procedure in the collective bargaining agreement. *Id*. The grievance procedure in the collective bargaining agreement included an arbitration clause, which the employer sought to enforce. *Id.* at 1295. The district court granted the employer's motion for summary judgment holding that the retirees suit was barred by their failure to exhaust the grievance remedy contained in the collective bargaining agreement. *Id*.

On appeal, the retirees argued that they did not have to exhaust grievance remedies in the CBA because the term "union" as used in the grievance procedure did not encompass retirees. The employer, on the other hand, argued that the terms "retirees" and "employees" were synonymous for purposes of the grievance procedure because a union that had bargained on behalf of former employees, who were now retirees, "has an interest in enforcing the contract and thus the authority to represent retirees in grievance and arbitration proceedings." *Id.* at 1296, 1297. The Eighth Circuit rejected the employer's argument and reversed stating:

> The cases [the employer] cites, *e.g. United Steelworkers of America, AFL-CIO v. Canron, Inc.*, [and] *Textile Workers Local 129 v. Columbia Mills* [citations omitted] . . . support only the proposition that a union has standing to assert retirees' rights under a collective bargaining agreement to which it is a party *if it chooses* and that an employer may not refuse to arbitrate its contractual obligations with the union. These cases do not establish that a union which does bargain for its retirees becomes their *exclusive* representative and that the retirees then *must* proceed through the union.

7

*Id.* at 1296.

IAM, selectively extracting language from *Anderson*, argues that it has standing to pursue arbitration on its own, institutional, behalf *if it so chooses*. To support this contention, IAM relies on the above quoted *dictum* in *Anderson* as well as on the *Canron* and *Columbia Mills* cases cited in *Anderson*. None of these cases, however, support IAM's contention. *Anderson* merely stands for the proposition that individual retirees do not have to exhaust grievance remedies. The plaintiffs in *Anderson* were individual retirees, not a union. Thus, the Eighth Circuit's holding in *Anderson* did not concern a union's standing to compel arbitration. Moreover, the *Canron* and *Columbia Mills* cases to which *Anderson* cites are also factually distinguishable from the present case.

In *Canron*, the Third Circuit held that a union had standing to compel arbitration where the employer had *contractually* agreed in the *current* CBA to continue premium payments for retirees. *United Steelworkers of America, AFL-CIO v. Canron*, 580 F.2d 77, 80 (3d Cir. 1978). In this case, Canron, Inc. ("Canron") acquired the assets of Shahmoon Industries ("Shahmoon"). *Id*. at 78. At the time of sale, Shahmoon was a party to a CBA with the United Steelworkers of America, AFL-CIO ("the union"). In this agreement, effective August 1, 1969, for a term of three years ("the 1969 Agreement"), Shahmoon agreed to provide health insurance coverage "for all *retired* employees and all eligible dependents." *Id*. at n.1. After the 1969 Agreement expired, Canron entered into another CBA with the union effective August 1, 1972 ("the 1972 Agreement"). *Id.* at 79. The 1972 Agreement contained a contractual provision to pay retirees' health insurance premiums that was identical to the one in the 1969 Agreement. On July 1, 1974, Canron gave notice that it would discontinue paying retirees premiums. The union thereafter brought suit under

section 301 of the LMRA to compel arbitration of the health insurance premium provision in the 1972 Agreement. The district court granted the union's motion for summary judgment. *Id.*

On appeal, Canron argued that the union lacked standing to sue on behalf of Shahmoon's retirees. *Id.* at 80. The Third Circuit disagreed holding that the union had standing to represent the retirees in seeking arbitration. The circuit stated,

> If Canron had *contractually* agreed in th[e] 1972 labor contract to continue such premium payments for Shahmoon's retirees, then *under accepted contract principles* the union has a legitimate interest in protecting the rights of retirees and is entitled to seek enforcement of the applicable *contract* provisions.

*Id.* at 81 (emphasis added).

Similarly, in *Columbia Mills*, a union brought an action pursuant to the LMRA to compel arbitration of an employer's intention to terminate retirees health insurance benefits. *Workers of America, AFL-CIO, LOCAL 129 v. Columbia Mills, Inc.*, 471 F. Supp.2d 527, 528 (N.D.N.Y. 1978). The union argued that the employer's proposed termination of health insurance benefits was in breach of an article of the *current* labor agreement providing that the company would provide health insurance for retirees for the duration of their natural lives. *Id.* at 529. The employer argued that grievance procedure in the CBA only applied to grievances between "the employer and Union or an employee." *Id.* at 530. The Third Circuit disagreed with the employer's argument and reversed holding that if the company *contractually* committed itself to provide continuous insurance coverage, "then under accepted contract principles the union has a legitimate interest in protecting the rights of retirees and is entitled to seek enforcement of the applicable *contract* provisions." *Id.* at 531 (quoting Canron, 580 F.2d at 80, 81). The *Canron* and

9

*Columbia Mills* cases cited by IAM thus support the proposition that a union has standing to compel arbitration where an employer has *contractually* agreed to provide continuous insurance coverage for its retirees under a *current* CBA.

In the present case, however, IAM has not cited, nor was the court able to locate, any provision in the current CBA wherein Crown contractually agreed to provide health insurance benefits for retirees. While the current CBA does incorporate a health insurance policy for retirees by reference, the CBA itself does not contain any express contractual provision similar to the provisions in the *Canron* and *Columbia Mills* cases. Accordingly, the court must infer that such a provision was not bargained for by the Union on behalf of the retirees under the current CBA. Because no such contractual provision exists, the court concludes that IAM does not have "institutional" standing to compel arbitration.

In *Rosetto v. Pabst Brewing Co.*, 128 F.3d 538 (7th Cir. 1997), and the Northern District of West Virginia's decision in *Paper, Allied-Industrial, Chemical & Energy Workers International Union v. UCAR Carbon Company, Inc.*, 368 F. Supp.2d 548 (N.D.W.V. 2005). the courts held that a union lacked standing to compel arbitration on behalf of retirees under an CBA without the retirees consent. In *Rossetto,* Pabst Brewing Co. ("Pabst") and a district of the IAM union were parties to a line of successive CBA's. *Rosetto*, 128 F.3d at 538. The most recent CBA, effective from June 1, 1993, to June 1, 1995, included a provision providing health benefits for retired employees and their dependents. *Id.* On September 1, 1996, one year after the CBA expired, Pabst terminated retiree health benefits. The union thereafter filed a grievance alleging that Pabst breached the CBA by unilaterally terminating retiree benefits. *Id.* at 539. Plaintiffs, which consisted of a certified class of 41 retirees, brought an action under section 301 of the NLRA and section 502 of ERISA seeking reinstatement of their benefits. By agreement, Pabst reinstated retiree

10

benefits and extended the terms of the expired CBA. *Id.* After this agreement expired, however, Pabst again terminated retiree benefits. Plaintiffs then filed an amended complaint realleging Counts I and II of the original complaint and added Count III, which sought an order compelling arbitration of the union's initial grievance. The district court granted plaintiffs' motion to compel arbitration. *Id.*

On appeal, the Seventh Circuit raised the issue of the union's standing to pursue the retirees' grievance to arbitration *sua sponte*. In response, the union argued that it had "standing to pursue the retirees' grievance to arbitration because it's the Union's contract and the Union's right to arbitrate." *Id.* The Third Circuit rejected this argument stating:

> As a general principal, a union has standing under Article III of the Constitution to arbitrate the meaning of a collective bargaining agreement that grants right to third parties (in this case, retirees) simply by virtue of the fact that the union is a party to the contract. But this does not end our inquiry. . . . A union's power to negotiate with management derives from the fact that the union is the exclusive bargaining representative of a group of people. Labor jurisprudence is clear that retirees cannot be part of this group or 'bargaining unit.'. . . This is so even in a case where an employer modifies benefits that were originally established through collective bargaining. Because [the union] is not the exclusive bargaining representative of the forty-one retirees that make up the class, any claims for benefits here belong to the retirees individually, and the retirees may deal directly with Pabst in pursuing such claims.

*Id.* The court went on to state, however, that the union could take the retiree's claims to arbitration if each of the retirees assents to the union's representation. The court noted that retiree's assent was necessary to avoid the preclusive effect that an arbitration decision would have on the retirees' rights to pursue their statutory claims under ERISA. *Id.* at 541. While the union lacks standing to compel arbitration on its own behalf, it can pursue arbitration on behalf of those retirees who consent to union representation.

Similarly, in *UCAR Carbon Company*, a court in the Northern District of West Virginia held that a union lacked standing to sue on behalf of employees who had retired

11

prior to the current CBA's effective date and who had not consented to allow the union to represent them as a class. 368 F. Supp.2d at 548. UCAR argued that the union lacked standing to compel arbitration because "former employees who retired prior to April 9, 2001, [had] no vested contractual rights in the April 9, 2001 CBA." *Id.* The court, citing *Rossetto*, agreed, holding that the union lacked standing to compel arbitration under the grievance procedure. The court explained:

> The obligation to invoke grievance procedures is a matter of contract. [citations omitted]. Generally, a union has standing to arbitrate the meaning of CBA's that grant rights to third parties because the union is party to the contract and negotiates the CBA as the exclusive bargaining representative of a 'bargaining unit' of employees. Retirees may elect to have their interests represented by a union through class action certification. They are not considered 'employees' that are part of a 'bargaining unit,' however, because they 'do not have a sufficient interest to warrant participation in the election of a collective-bargaining agent.'

*Id.* at 551. The court went on to state that the union "cannot compel arbitration under the grievance and arbitration clause of the 2001 CBA because UCAR's pre-April 9, 2001 retirees have no vested rights under that contract [citations omitted]. Moreover, these retirees have not consented to allow [the union] to present their interests as a class." *Id.*

Consistent with the opinions in *Allied Steel, Rosetto and UCAR*, the Union in the present case lacks standing to compel arbitration on its own behalf regarding the modification and/or termination of retiree health benefits. Retirees are not part of the current bargaining unit and, therefore, have no vested rights under the current contract to pursue arbitration. The Union's argument that it has standing to compel arbitration on its own behalf for the apparent benefit of current and future employees simply lacks merit. The arbitration of the present dispute would benefit only current retirees. Despite active and retired employees "common concern in assuring that the [retirees'] benefits remain adequate, they plainly do not share a community of interests broad enough to justify

12

inclusion of the retirees in the bargaining unit." *Allied Steel*, 404 U.S. at 173. Because the Union only represents the current bargaining unit, it does not have standing to pursue arbitration on behalf of Continental/Crown retirees without their consent.

Because IAM lacks standing to compel arbitration, the court lacks subject matter jurisdiction over this dispute. However, the court will give IAM ninety days from the date of this Memorandum and Order to amend the complaint and/or substitute parties to demonstrate consent of the retirees in order to demonstrate standing and subject matter jurisdiction in this case. Failure to do so will result in dismissal of IAM's counterclaim against Crown. Accordingly,

IT IS ORDERED:

1. Crown's motion for summary judgment (Filing No. 82) is denied, but it is subject to reassertion following IAM's amended counterclaim, if any, as set forth herein.

2. IAM's motion for summary judgment (Filing No. 84) is denied.

3. IAM is given ninety days from the date of this order to amend its counterclaim consistent with this Memorandum and Order. Failure to do so will result in dismissal of this case.

DATED this 26th day of August, 2005.

BY THE COURT:

s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief Judge, United States District Court