IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CROWN CORK & SEAL COMPANY, INC., | ) | |
| | ) | 8:03CV222 |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, et al., | ) ) ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

This matter is before the court on the renewed motions for summary judgment of Counterclaim Plaintiff, International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM" or "the Union"), Filing No. 120, and Counterclaim Defendant, Crown Cork & Seal Company, Inc. ("Crown" or "the Company"), Filing No. 121. This is an action to compel arbitration of a dispute arising concerning a collective bargaining agreement, pursuant to the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) *et seq.*

**I. BACKGROUND**

The only claim remaining in this litigation is the Union's counterclaim to compel arbitration. *See* Filing No. 56, Memorandum and Order at 11 (D. Neb. 2004) (dismissing Crown's claims for declaratory relief under ERISA, as well as claims against three individual retirees). In its order denying the parties' earlier motions for summary judgment, this court found the Union lacked standing to compel arbitration on its own behalf, but could pursue it on behalf of those retirees who consented to the Union's union representation. *See* Filing No. 110, Memorandum and Order at 11 (D. Neb. August 26,

2005). The court granted the Union ninety days in which to amend its counterclaim to demonstrate standing. *Id.* at 13. The Union has since obtained the written consent of 650 of the 928 retirees covered by benefits plans at issue. *See* Filing Nos. 113, 117, & 119, Notices of Retiree Consent; 123, Index of Evidence, Exhibit ("Ex.") 23. These retirees have consented to representation by the Union in arbitration with Crown over a grievance involving changes that Crown made to their health benefits in 2003. *See* Filing No. 122, Renewed Joint Stipulation of Facts at 8. The parties agree that if the court orders arbitration, their authorizing retirees and their surviving spouses would be bound by the arbitrator's decision. *Id.*

The parties have filed amended pleadings and have renewed their motions for summary judgment on the arbitration issue. *See* Filing Nos. 116, Amended Counterclaim; 118, Answer; 120, Renewed Motion for Summary Judgment; 121, renewed Motion for Summary Judgment. The Union contends that the court should compel arbitration. It argues that the dispute concerning the company's unilateral reduction of retiree benefits arises under a collective bargaining agreement or agreements that contain broad arbitration clauses. Crown contends that it is entitled to summary judgment because the retiree health insurance benefits are "clearly not vested." It argues that the relevant agreements and plans have expired, and that since the agreements and plans do not specifically show that the parties agreed that the benefits were to vest, the Union's grievance is not arbitrable.

### A. Facts

The parties have filed a Renewed Stipulation of Facts and supporting evidence. *See* Filing Nos. 122 & 123. The stipulation establishes that Crown manufactures

packaging materials. Crown and its subsidiaries operate manufacturing facilities throughout the United States and elsewhere. On July 15, 1990, Crown acquired Continental Can Company's Metal Division. As a result, Crown acquired additional facilities throughout the United States, a number of which were covered by collective bargaining agreements.

IAM is a labor organization representing employees in an industry affecting commerce and, for a number of years, has represented those employed by Crown and its predecessor, Continental. Before Crown acquired Continental, Continental had entered into a series of successive collective bargaining agreements ("CBAs") with IAM that governed the terms and conditions of employment for many hourly employees at Continental plants. For each contract term, the Continental Master Agreement consisted of one collective bargaining agreement that covered multiple plants.[1] Crown had not entered into any CBAs with the Union prior to its acquisition of Continental. As a result of its acquisition of Continental's Metal Division in 1990, Crown assumed the Continental Master Agreements and related benefit plans for certain plants formerly operated by Continental.

Since 1993, Crown and IAM have been parties to a series of successive master collective bargaining agreements governing the terms and conditions of employment of IAM-represented employees working for Crown and at former Continental facilities. The

---

[1] The following Continental/IAM Master Agreements have been submitted in evidence: December 1, 1968–March 31, 1971, Ex. 1 ("1968 Master Agreement"); April 1, 1971–March 31,1974, Ex. 2 ("1971 Master Agreement"); April 1, 1974–April 14, 1977, Ex. 3 ("1974 Master Agreement"); December 11, 1977–March 31, 1981, Ex. 6 ("1977 Master Agreement"); April 1, 1981–April 1, 1984, Ex. 8 ("1981 Master Agreement"); April 1, 1986–March 31, 1989, Ex. 10 ("1986 Master Agreement"); and April 1, 1989–March 31, 1993, Ex. 12 ("1989 Master Agreement"). Filing No. 123, Index of Evidence. The parties stipulate that they believe the April 1, 1981– April 1, 1984 Master Agreement was extended through March 31, 1986, but have been unable to locate that Extension Agreement. Filing No. 122, Renewed Joint Stipulation at 2.

first master collective bargaining agreement between Crown and IAM was effective April 30, 1993–March 31, 1996. *See* Filing No. 123, Ex. 13. Each agreement was generally in force for three years, and for each contract term, the Crown Master Agreement has consisted of one collective bargaining agreement covering multiple plants.[2]

Continental, and later Crown, provided medical benefits to retirees and their qualified dependents (hereinafter, collectively, "retirees") who had been members of the Union while employed by Continental.[3] These medical benefits were negotiated with IAM. As part of each collective bargaining agreement itself, each Continental Master Agreement from 1968 through 1981 contained a benefits plan entitled, "United States Group Insurance Agreement." *See* Exs. 1-3, 6. Under the benefits plan, Continental Master Retirees received hospital, surgical, and medical benefits. The plans were supplemented by other documents. *See, e.g.,* Exs. 4 & 5 (group insurance plan booklets effective April 1, 1974), Ex. 7 (1977 group insurance summary plan document ("SPD")).

Beginning in 1981, the benefits plans were no longer part of the Continental Master Agreements, but were incorporated by reference. *See, e.g.,* Ex. 8. The referenced document is entitled, "Your Life Insurance and Health Care Benefits during Retirement (Established pursuant to the CBA between Continental and IAM effective April 1, 1981–and as amended August 1, 1988)" ("1981 Group Insurance Agreement"). Ex. 11. Again, the

---

[2] The following Crown/IAM Master Agreements have been submitted in evidence: April 30, 1993–March 31, 1996, Ex. 13 ("1993 Master Agreement"); April 1, 1996–March 31, 1999, Ex. 15 ("1996 Master Agreement"); April 1, 1999–March 31, 2002, Ex. 16 ("1999 Master Agreement"); and April 1, 2002–March 31, 2005, Ex. 18 ("2002 Master Agreement"). Filing No. 123, Index of Evidence.

[3] The parties stipulate that they are not aware of any Continental Master Retirees who retired prior to the December 1, 1968–March 31, 1971 contract and are still receiving health benefits.

plans were supplemented by other documents.  *See, e.g.*, Ex. 9 ("the 1981 Group Insurance SPD").

The Continental/Crown Master Agreements in effect from 1968 through 1993 all contain language to the effect that:  "[the Company] agrees . . . to continue said Group Insurance Agreement without modification for the life of this [Collective Bargaining] Agreement."  *See*, *e.g.,* Ex. 10 at 67; Ex. 12 at 67.  The 1981 Group Insurance SPD states, under the heading "the future":  "Continental hopes and expects to continue the Plans indefinitely, but reserves the right to change or terminate them in the future subject, naturally, to any outstanding contractual agreements."  Ex. 9 at § 21.00.  The plan included that same language when amended in 1988.  *See* Ex. 11 at 52.  The 1981 Group Insurance Agreement (as amended in 1988) also provides for coordination of employer-provided benefits with Medicare benefits, such that the benefits would be reduced by the amount payable by Medicare.  *Id.* at 46.

The 1993 and 1996 Crown Master Agreements incorporate by reference a Group Insurance Plan dated April 1, 1993.  *See* Ex. 13 at 45; Ex. 15 at 45.  The 1993 and 1996 Crown Master Agreements contained substantively identical provisions:  "The Company agrees to . . . continue said Group Insurance Agreement without modification for the life of this [collective bargaining] Agreement."  Ex. 13 at 45; Ex. 15 at 45.  The 1993 plan provides, under the heading "Extent and Limit of Coverage":

> Crown expects to continue these plans indefinitely, but reserves the right to amend, modify, or discontinue the plans at any time subject to, and within the framework of, applicable federal legislation and subject to any outstanding contractual agreements.  The Plans do not provide for benefit payments in any case or under any condition not identified and provided for in the Plans.

Ex. 14 at 66.

The 1999 Master Agreement also incorporates a group insurance agreement with a similar provision. Ex. 16 at 42, Ex. 17 at 1-2.

The documentary evidence submitted in support of the parties' respective positions shows that in order to become eligible for post-retirement medical benefits under any of the Crown or Continental Master Agreements, the employee had to have completed ten years of continuous service and had to "retire with a pension during the term of this agreement under the Company's Pension Plan agreed upon with the Union." *See, e.g.,* Ex. 1 at 188, Ex. 2 at 255, Ex. 3 at 280, Ex. 6 at 322. The 1993, 1999, and 2002 agreements provided for eligibility on completion of "ten years of continuous service as a Crown employee" and provided that the retiree "must be eligible to receive an *immediate* pension benefit from the Pension Plan between Crown and the IAM," but excluded individuals eligible for deferred pension benefit. Ex. 14 at 47, Ex. 17 at 57, Ex. 19 at 12-13 (emphasis added).

The 1968 through 1989 Master Agreements provided that "coverage under this Paragraph 5.2 [Post-Retirement Hospital Medical Surgical Benefits] for the retired employee shall cease upon his death. Coverage for a female spouse shall cease upon the earlier of (1) her death or (2) her remarriage." *See, e.g.,* Ex. 1 at 193, Ex. 2 at 263, Ex. 3 at 293, Ex. 6 at 335, Ex. 11 at 48. The 1977 group insurance plan also provides, under the heading "lifetime coverage," "[y]our personal Basic Plan coverage continues until your death." Ex. 4 at 28. In addition to coverage until the retiree's death or a spouse's death or remarriage, the 1977 and 1981 plans also provide that coverage for the dependent child of a retiree continues after the retiree's death until either the child is no longer a dependent or the spouse's coverage stops. Ex. 7 at § 19.00, Ex. 9 at § 19.00, Ex. 11 at 48. Also,

several of the retiree medical plans contain references to "lifetime maximum" major medical coverage. *See, e.g.,* Ex. 11 at 37, Ex. 14 at 49, Ex. 17 at 61. Some plans also state that, when a retiree becomes eligible for Medicare, his or her major medical coverage will continue in effect on the same basis for the retiree, eligible dependents, or a surviving spouse. *See, e.g.,* Ex. 14 at 56, Ex. 17 at 66. The plan in force from 2002 to 2005 states that in the event of the retiree's death, his or her spouse will continue to have coverage unless he or she remarries. Ex. 19 at 13.

The 1981 through 2002 Master Agreements all contain provisions that the company agrees to modify "Group Insurance Agreements" incorporated in the prior CBA and to continue the agreements for the life of each Master Agreement. *See, e.g.,* Ex. 8 at 82, Ex. 10 at 67. The Master Agreements also contain duration clauses that state that the benefits plans incorporated into each Master Agreement would be continued without modification for the life of each Master Agreement. Ex. 1 at 69, Ex. 2 at 84, Ex. 3 at 85, Ex. 6 at 85-86, Ex. 8 at 82, Ex. 10 at 67, Ex. 12 at 67, Ex. 13 at 45, Ex.15 at 45, Ex. 16 at 42. Also, all of the benefits plans contain coordination-of-benefits clauses that provided that benefits for Medicare-eligible retirees and their eligible spouses were reduced to account for those benefits. Ex. 1 at 191-92, Ex. 2 at 260-61, 262-63, Ex. 3 at 285, 287, Ex. 6 at 326-27, 328-29, Ex. 9 at § 10.00, Ex. 11 at 5, Ex. 14 at 56, Ex. 17 at 66.

Crown's records show that when Crown acquired Continental's Metal Division in 1990, the 1981 Group Insurance Agreement was applied to all Continental Master Retirees regardless of their retirement date. The 1981 Group Insurance Agreement continued to be applied to all Continental/Crown Master employees who retired before March 31, 1993. Continental Master Retirees continued to receive benefits in accordance with the 1981

Group Insurance Agreement until August 1, 2003, when the changes that are the subject of this action took place.

Until August 1, 2003, all Crown Master Retirees who retired before April 1, 2002, received post-retirement health benefits under one of two plans. *See* Ex. 14 & Ex. 17. The 1993 plan, effective until April 1, 1999, covers employees who retired between those dates, and the 1999 plan, effective until April 1, 2002, covers employees who retired between those dates. *Id.* In addition, the 2002 plan (applied retroactively to April 2002) was in force until June 1, 2005, and covers all Crown Master employees who retired between those dates. Ex. 19.

The parties stipulate that the only unilateral change to Continental/Crown's Master retirees' health benefits between 1988 (the effective date of the 1981 group insurance agreement, as amended) and 2003 was the introduction of a Pharmacy Card program that simplified the procedure for reimbursement of prescription costs and eliminated deductible requirements for prescriptions purchased at participating pharmacies. Also, in 1994, Crown began to administer the retirees' benefit plans internally in its own insurance department rather than utilizing Metropolitan Life Insurance Company as its plan administrator.

In June 2003, Crown informed the Union that it would be adopting a new health plan for all Crown/Continental Master Retirees who had retired prior to April 1, 2002.[4] The new plan took effect on August 1, 2003, at which time Crown discontinued the previous health plans covering those Crown and Continental IAM Master Retirees and their qualifying

---

[4]The 1999 Group Insurance Agreement had been temporarily extended to June 1, 2002. When the 2002 Group Insurance Agreement was finalized on June 1, 2002, it was applied retroactively to include employees who retired on or after April 1, 2002.

8

dependents. Ex. 20. Neither the discontinuation of the old plan nor the adoption of the new plan was the subject of negotiation with the Union. The changes to retiree health benefits under the new plan included increased lifetime-maximum benefits, premium sharing, increased deductibles and out-of-pocket limits, decreased hospitalization coverage, and the elimination of the coverage of most dependent children. Ex. 20. Crown views the August 1, 2003, changes as modifying IAM Master Retirees' health benefits so that the benefits are similar to its active employees' health benefits.

All of the applicable Continental or Crown Master Agreements contain a grievance and arbitration clause covering "any difference between the Local Management and the Union or employees as to the interpretation or application of, or compliance with, this Agreement respecting wages, hours, or conditions of employment" that culminates in binding arbitration. *See, e.g.,* Ex. 1 at 55, Ex. 2 at 64, Ex. 3 at 69, Ex. 6 at 64, Ex. 8 at 61, Ex.10 at 44, Ex. 12 at 44, Ex. 13 at 30, Ex. 15 at 29, Ex. 16 at 28, Ex. 18 at 2.

The Union filed a grievance on July 1, 2003, over the adoption of the new retiree benefits plan and the transfer of its retirees to that plan. *See* Ex. 21. The Union's grievance report form stated: "Crown Cork and Seal Company, Inc. (CCS), is in violation of the present and past collective bargaining agreements between [IAM] and Crown by unilaterally implementing changes to the current coverage of [IAM] members retiring under this and past collective bargaining agreements between the parties." Filing No. 123, Ex. 21.

Crown declined to submit the dispute to arbitration. *See* Ex. 22. It responded that certain plants were covered by a separate agreement independent of the Master Agreement. *Id.* With respect to the remaining plants, it stated:

9

>Crown's announced changes do not affect persons who retire under the now current Master Agreement between the parties. Therefore our position is as follows. The dispute between the parties is not arbitrable. The IAMAW does not represent past retirees and the Master Agreement between the parties by its terms is limited to employees working on jobs included in its bargaining unit. Moreover, the Master Agreement expressly limits grievances to the interpretation or application of the Agreement. Respectfully, we maintain that the company has not violated any provision of the Master Agreement.

Ex. 22.

## II. DISCUSSION

### A. Law

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Id.*

Interpretation of labor contracts under the LMRA is a matter of federal common law. *See Textile Workers Union of Am. v. Lincoln Mills,* 353 U.S. 448, 456 (1957). Under the body of law governing the interpretation of a labor contract, a court should resort to traditional principles of contract interpretation to the extent such principles are consistent with federal labor law. *International Union of Operating Eng'rs Local 571 v. Hawkins Const. Co.,* 929 F.2d 1346, 1349 (8th Cir. 1991) (the substantive law as it has developed in the courts is largely traditional contract law informed by national labor policies). An unambiguous contract must be enforced according to its terms, under both the common law and labor law. *See American Federation of Grain Millers v. International Multi-Foods*

*Corp.,* 116 F.3d 976, 980 (2d Cir. 1997) (stating under the LMRA that "[a]ll courts agree that if a document unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced").

In order to interpret a labor agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and customs pertaining to such agreements. *Transportation and Communication Emps. Union v. Union Pac. R.R.,* 385 U.S. 157, 161 (1966). Related labor agreements should be construed together, even where there is no express incorporation of terms. *See id.* at 161. Also, it is well established that the parties' "practice, usage and custom" is of significance in interpreting their agreement. *See Consolidated Rail Corp. v. Railway Labor Executives Ass'n,* 491 U.S. 299, 311-12 (1989); *see also Senior v. NSTAR Elec. & Gas Corp.,* 449 F.3d 206, 221 (1st Cir. 2006) (considering related agreements, the practices in the company, and the custom and usage to determine vesting of retiree dental benefits).

Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute to which he has not agreed so to submit. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002) (*quoting Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960). However, once parties have agreed to a contract containing an arbitration clause, courts have "long recognized and enforced a 'liberal federal policy favoring arbitration agreements.'" *Id.* (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983)).

If an agreement to arbitrate is present, courts, not arbitrators, determine the question of arbitrability, unless the parties unambiguously provide otherwise in their contract. *Howsam,* 537 U.S. at 83; *International Bhd. of Elec. Workers v. GKN Aerospace*

*N. Am., Inc.,* 431 F.3d 624, 627 (8th Cir. 2005); *John Wiley & Sons v. Livingston,* 376 U.S. 543, 547 (1964) ("[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty"); *AT & T Techs. v. Commc'ns Workers,* 475 U.S. 643, 649 (1986).

The court applies the principles derived from a series of cases known as the *Steelworkers Trilogy* to determine whether a dispute is arbitrable. *See United Steelworkers v. Am. Mfg. Co.,* 363 U.S. 564 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960). Under the *Steelworkers Trilogy,* (1) arbitration is a matter of contract and may not be ordered unless the parties agreed to submit the dispute to arbitration; (2) unless the parties provide otherwise, courts decide the issue of whether the parties agreed to arbitrate; (3) courts cannot weigh the merits of the grievance in determining whether the claim is subject to arbitration; and (4) when an arbitration clause exists in a contract, there is a presumption of arbitrability unless it is clear that the arbitration clause is not susceptible of an interpretation that covers the dispute. *GKN Aerospace,* 431 F.3d at 627*; Teamsters Local Union No. 688 v. Indus. Wire Prods., Inc.,* 186 F.3d 878, 881 (8th Cir. 1999).

Thus, when deciding whether to compel arbitration, this court applies a two-part test. *See United Steelworkers v. Duluth Clinic, Ltd.,* 413 F.3d 786, 788 (8th Cir. 2005). First, the Court must determine whether a valid agreement to arbitrate exists. *Id.* Assuming such an agreement exists, "[t]he only question is whether it covers this dispute." *Id.* To make that determination, the court first considers whether the arbitration clause is narrow or

broad. *Id.* at 789. If the clause is broad, the court analyzes whether the dispute relates to the subject matter of the agreement. *Id.* A clause providing that "any controversy or claim arising out of or relating to the agreement" is subject to arbitration is characterized as a broad arbitration clause. *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.,* 118 F.3d 619, 620-21 (8th Cir. 1997). Where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, there is a presumption of arbitrability. *Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 209 (1991) (noting that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute). The presumption, however, is not applied "wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate." *Id.* (noting that the presumption of arbitrability will apply only where a dispute has "its real source" in the contract). Ordinarily, contractual obligations will cease upon termination of the bargaining agreement. *Id.* at 207. Exceptions are determined by contract interpretation. *Id.* Where rights have accrued or vested under the agreement or where the agreement provides "in explicit language" that certain benefits survive the agreement's termination or expiration, "disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions." *Id.* at 207-08. The presumption of arbitrability is not imposed on ERISA trustees seeking to enforce retiree benefits, but "[t]he presumption of arbitrability is, of course, generally applicable to any disputes between the union and the employer." *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 372 n.14 (1984) (holding that the presumption of arbitrability is not a proper rule of construction in determining whether

arbitration agreements between the union and the employer apply to disputes between trustees and employers, even if those disputes raise questions of interpretation under the collective-bargaining agreements).[5]

Employers may provide retirees with vested retiree welfare benefits by contract or otherwise. *Senior v. NSTAR Elec. & Gas Corp.,* 449 F.3d at 207 (stating, under both the LMRA and ERISA, "if an employer promises vested benefits, that promise will be enforced"); *see also Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 181 n.20 (1971) (holding that a union and company may agree to bargain for retirees' benefits, and once these bargained-for benefits are vested, retired workers may have contract rights under the collective bargaining agreement which they can enforce). A presumption of arbitrability will apply to disputes over retirees' benefits if the parties have contracted for such benefits in their collective bargaining agreement and if there is nothing in the agreement that specifically excludes the dispute from arbitration. *Cleveland Elec. Illuminating Co. v. Utility Workers Union of America,* 440 F.3d 809, 816 (6th Cir. 2006).

Generally, the court is to remain blind to the merits of the purported grievance during the process of determining arbitrability. *See AT & T Techs.,* 475 U.S. at 649-50; *GKN Aerospace,* 431 F.3d at 627. A limited exception exists where a court must consider the merits of a grievance to decide if the dispute is actually arbitrable. *E.g., Litton,* 501 U.S. at 208-10; *GKN Aerospace,* 431 F.3d at 627-28. This exception is designed to prevent parties from being "forced to arbitrate grievances that have no relationship whatsoever to the

---

[5]The requirement of a clear and express statement of vesting imposed by some courts in the ERISA context has been rejected with respect to the LMRA "as not compelled by federal labor law." *Senior v. Nstar Elec.,* 449 F.3d at 216 (finding a presumption either in favor of or against vesting is inappropriate in an NLRA case).

collective bargaining agreement." *GKN Aerospace,* 431 F.3d at 627. A court is required to consider the merits "at least to the point of determining whether it is 'possible' for an arbitrator, consistent with the plain meaning of the agreement, to rule in favor of the party demanding arbitration." *Id.* at 625 (stating that "[t]he attendant inquiry is whether the agreement 'could be read' to support the claim of the party seeking arbitration").

In this circuit, whether retiree benefits are vested depends, as a matter of contract interpretation, on whether the parties intended the benefits to vest. *Barker v. Ceridian Corp.,* 122 F.3d 628, 634-35 (8th Cir. 1997) (finding ambiguity presented by plan language that the employer would pay medical benefits until a retiree died and the plan's reservation-of-rights clauses); *DeGeare v. Alpha Portland Indus., Inc.,* 837 F.2d 812, 815 (8th Cir.1988), *vacated and remanded on other grounds sub nom. DeGeare v. Slattery Group, Inc.,* 489 U.S. 1049 (1989) (stating "[O]rdinary contract construction principles should be used to determine if the benefits are vested"). The issue is one of contract interpretation, and, if necessary, a consideration of the relevant extrinsic evidence and the parties' course of dealing. *Local Union No. 150-A, United Food and Commercial Workers Int'l Union v. Dubuque Packing Co.,* 756 F.2d 66, 69-70 (8th Cir.1985) (finding language that implied that benefits were to continue was sufficient to require examination of extrinsic evidence); *Jensen v. SIPCO, Inc.,* 38 F3d 945, 950, 953 (8th Cir. 1994) (affirming judgment under ERISA for retirees although the relevant language was "at most an ambiguous expression of an intent to vest retiree benefits").

The expiration of a collective bargaining agreement is not fatal to a grievance so long as the grievance "arose out" of the contract. *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union,* 430 U.S. 243, 249-55 (1977) (rejecting the argument that an

obligation to arbitrate expires with the agreement); *see Litton,* 501 U.S. at 203-08; *Chauffeurs, Teamsters & Helpers, Local Union 238 v. C.R.S.T., Inc.,* 795 F.2d 1400, 1403-04 (en banc) (8th Cir. 1986) ("[F]or a right to arbitration to exist the grievance must either involve rights which to some degree have vested or accrued during the life of the contract and merely ripened after termination, or relate to events which have occurred at least in part while the agreement was still in effect.").

### B. Analysis

Resolution of the motions for summary judgment is solely dependent on whether the Union's grievance is subject to arbitration. In its earlier order, the court stated that the critical question for purposes of determining arbitrability was whether the retirees' benefits had vested. *See* Filing No. 56, Memorandum and Order at 10 (D. Neb. Jan. 20, 2004). The merits of the underlying dispute are at issue only as they relate to the court's determination of arbitrability.[6]

The court first finds that the CBAs at issue contain valid arbitration agreements that contain broad arbitration clauses. The dispute relates to the subject matter of the collective bargaining agreement in that it involves a bargained-for element of the retirees terms and conditions of their employment. The fact that the retirees are not included in the bargaining unit is of no consequence since the Union now has consent to proceed on their behalf.

The grievance at issue was filed on July 1, 2003. At that time, a collective bargaining agreement between IAM and Crown was in effect, and the retirees were covered by a plan

---

[6]The determination of "vesting" in the context of arbitrability involves interpretation of the labor agreements only. Because there is no ERISA claim, the distinctive body of Eighth Circuit caselaw developed to guide district courts in the determination of whether welfare benefits are vested under ERISA is generally inapplicable, except to the extent that it involves interpretation of labor agreements.

16

incorporated into the agreement. *See* Exs. 18 & 19. The grievance thus involves a dispute over benefits provided under a labor contract that was in force at the time of the filing of the grievance. Although prior agreements may be relevant to determine the scope or extent of benefits to which the retirees may be entitled, or the extent to which the company can unilaterally change the benefits, the dispute is premised on the agreement in effect at the time of the filing of the agreement. The dispute does not involve a right to benefits conferred in an expired or nonexistent agreement. That is not to say that the present agreement establishes any right to continuation of benefits for life or to any specific level of benefits. The retirees' medical benefits, albeit reduced, were provided pursuant to a labor agreement between the company and the Union. Retiree health benefits had been provided in every collective bargaining agreement between the parties. The retirees are presently receiving benefits pursuant to a collective bargaining agreement and they challenge a component of that agreement. It cannot be said that the grievance at issue has "no relationship whatsoever to the collective bargaining agreement."

   The court finds it would be possible for an arbitrator, consistent with the plain meaning of the agreement, to rule in favor of the Union. This is so because the evidence reveals numerous ambiguities in language that relate to "vesting" in the submitted documents. Although the plans contain duration clauses that may be generally inconsistent with vesting, the master agreements and plans in effect until 1993 also contain language that the medical benefits will continue until death. Other provisions in the collectively-bargained plans state that benefits cease on the death of a surviving spouse, that major medical eligibility for the retiree, spouse and dependents continues following a retiree's eligibility for Medicare, and that, in the event of the retiree's death, a spouse's coverage

continues until remarriage. These statements are not consistent with vesting. Explicit language stating that benefits would be provided until death was present in agreements and plan documents until 1993. Arguably, even a presumption against vesting would not overcome this explicit provision of lifetime benefits to certain retirees. Although explicit language arguably creates an obligation on Crown to provide health benefits, the scope of the obligation may not have been forever fixed. *See, e.g, Zielinski v. Pabst Brewing Co.,* — F.3d —, —,  2006 WL 2567468, *3-4 (7th Cir. Sept. 7, 2006) (obligating company to provide benefits at a level "reasonably commensurate" with earlier plan).

Moreover, the evidence shows that, notwithstanding the lack of specific language requiring continuation of the retiree benefits provided by the 1981 plan, the Company continued to pay benefits pursuant to the 1981 plan, as amended in 1988, until August 1, 2003. The Company had not made any unilateral substantive changes to retirees' medical benefits until it made the changes that are the subject of this litigation in 2003. With respect to post-1993 retirees, the Company continued to provide benefits under the 1981 (amended in 1988) agreement. Such continuation of benefits can be evidence that the benefits were vested. *See Anderson v. Alpha Portland Inds., Inc.*, 836 F.2d 1512, 1518 (8th Cir. 1988); *Dubuque Packing,* 756 F.2d at 69. Also, each successive agreement continued retiree benefits that had been established in the previous agreements. Accordingly, the parties' customs and usage arguably show an intent that the benefits vest.

Until 2003, the provision of health benefits to retirees had been the subject of bargaining. Crown's retiree medical benefits are explicitly tied to receipt of pension benefits and are arguably an adjunct to the pensions, which are vested. Also, the conditioning of retiree medical benefits on a term of service can imply vesting.

Based on the evidence submitted to the court, the court finds that it would be possible for an arbitrator, consistent with the plain meaning of the agreement, to rule in favor of the Union. Accordingly, the dispute arises under the collective bargaining agreement and is subject to arbitration. The court makes no further findings with respect to the merits and nothing in this opinion should be interpreted to convey any position on the merits. Accordingly, the court will compel arbitration in this matter.

IT IS ORDERED:

1. Counterclaim Plaintiffs' renewed motion for summary judgment (Filing No. 120) is granted.

2. Counterclaim Defendant's renewed motion for summary judgment (Filing No. 121) is denied.

3. The parties shall arbitrate this matter in accordance with the collective bargaining agreement.

4. This action is dismissed.

DATED this 25th day of September, 2006.

BY THE COURT:

s/ Joseph F. Bataillon
Chief Judge, United States District Court